UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X

JACQUIONE JOHNSON,

         Plaintiff,

    - against -

BRYCO ARMS, et al.

        Defendants.
- - - - - - - - - - - - - - - -X
JOAN TRUMAN SMITH,

         Plaintiff,

    - against -

BRYCO ARMS, et al.

        Defendants.
- - - - - - - - - - - - - - - -X
CITY OF NEW YORK,

         Plaintiff,

    -against-

BERETTA USA CORP., et al.

        Defendants.
- - - - - - - - - - - - - - - -X

Civil Action
No. CV-03-2582

(Weinstein, J.)
(Pollak, M.J.)

Civil Action
No. CV-02-3029

(Weinstein, J.)
(Pollak, M.J.)

Civil Action
No. CV-00-3641
(Weinstein, J.)
(Pollak, M.J.)

**BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND
EXPLOSIVES' OBJECTIONS TO ORDER OF MAGISTRATE
JUDGE DATED MAY 19, 2004**

ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York
One Pierrepont Plaza, 14th Floor
Brooklyn, New York 11201

ELLIOT M. SCHACHNER
VINCENT LIPARI
Assistant U.S. Attorneys

## PRELIMINARY STATEMENT

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") respectfully submits its objections to the Order of the magistrate judge dated May 19, 2004. The magistrate judge, _inter alia_, refused to quash the subpoena dated April 15, 2003 of plaintiff Joan Truman Smith, the subpoena dated April 19, 2004 of plaintiff City of New York and the subpoena dated April 21, 2004 of plaintiff Jacquione Johnson, insofar as they sought certain information that is protected from disclosure by the 2004 Appropriations Act.

As shown below, the subpoenas should be quashed because Congress, by enacting the 2004 Appropriations Act, has left ATF powerless and strictly forbidden it from acting to disclose, for use on the public record at trial, any trace reports, multiple sales reports or records required to be maintained by dealers, which would necessarily involve an expenditure of funds. The 2004 Appropriations Act bar on "disclos[ure] to the public" of this material prohibits ATF from taking any and all actions necessary to produce this material for the purpose of testimony and documentary evidence to be disclosed in open court and on the public record to jurors and spectators, who would be under no obligation to keep the material confidential. The magistrate judge committed an error of law by concluding that such disclosure would not constitute a "disclos[ure] to the public" in

violation of the 2004 Act. The magistrate judge's suggestion that the Court could preclude the public, including the press, from listening to testimony that conveyed this material and from reviewing documents that contain this material does not alter the fact that the material would be disclosed to the jurors. Furthermore, this suggestion raises severe constitutional questions and, if adopted by the Court, would almost certainly lead to further litigation.

The magistrate judge committed a further error of law by holding, in the alternative, that the appropriation restriction could be circumvented by having the plaintiffs reimburse ATF for the expenses incurred in producing the requested material. This holding violates established law concerning federal expenditures subject to appropriations restrictions and is clearly contrary to the intent of Congress that the material not be publicly disclosed.

## STATEMENT OF FACTS

### I.    The Instant Consolidated Actions

#### A.    Allegations of the Complaints

The allegations of liability in the  complaints in
Johnson v. Bryco Arms and Smith v. Bryco Arms (collectively, "the
Wendy's actions") arise out of the same facts.  Plaintiffs
Jacquione Johnson and Joan Truman Smith, who sues on behalf of
her late daughter, assert claims for injuries sustained because
of a shooting on May 25, 2000 during an attempted robbery at a
Wendy's restaurant in Queens.  The perpetrators, John Taylor and
Craig Goodineaux, were apprehended, convicted and sentenced.  A
single firearm was used in the shooting.  It was recovered.

The plaintiffs in the Wendy's actions ("the Wendy's
plaintiffs")  allege that Bryco Arms and B.L. Jennings
manufactured the firearm.[1]  Bryco and B.L. Jennings allegedly
distributed the firearm to defendant Acusport Corporation
("Acusport"), which then distributed it to its retailer,
defendant Atlantic Gun & Tackle, Inc. ("Atlantic").  Atlantic
allegedly sold the firearm to Angela Freeman, supposedly a straw
purchaser, in Cleveland, Ohio.  The Wendy's plaintiffs claim that
through several improper private transactions, the firearm
ultimately was sold in New York and used in the Wendy's shooting.

---

[1]   Bryco and B.L. Jennings are  not defendants because they
filed in bankruptcy and all claims against them are subject to
the automatic stay of 11 U.S.C. § 362.

The Wendy's plaintiffs claim that Acusport and Atlantic caused their injuries by engaging in negligent sales and marketing practices and creating a public nuisance by selling firearms with knowledge or reason to believe that a substantial number of them, such as the firearm at issue here, would be used in criminal activity.  Acusport and Atlantic supposedly knew or had reason to know this because they received from ATF an inordinate number of requests for "trace data", i.e. sales histories of guns that are identified in law enforcement investigations.  According to the Wendy's plaintiffs, Acusport and Atlantic allegedly failed to implement reasonable measures and to adopt policies and practices which could have curtailed the number of firearms which ended up in streams of commerce from which they were likely to reach criminal users.

In its complaint in City of New York v. B.L. Jennings Inc. (the city action), plaintiff City of New York alleges that the defendants, thirty gun manufacturers and distributors (collectively, the city defendants), have negligently failed to prevent the diversion of guns to the illegal gun market. According to the City of New York, the defendants have oversupplied guns to states which have relatively less restrictive gun laws, knowing that the oversupply will be sold to purchasers in states and localities, such as New York City, which have relatively stricter gun laws. The City of New York further

alleges that the city defendants have increased the production of particular handguns that are popular for use by criminals and have sometimes designed and advertised particular features of their products that appeal to purchasers with criminal intent. According to the City of New York, the city defendants are aware of this diversion, because when ATF traces a gun involved in a crime, it contacts that manufacturer and requests that the manufacturer identify the purchaser and date of sale.

**B.    The NAACP Protective Order**

The trace data for the period 1989 through 2000, along with data concerning multiple sales of guns to certain individuals during that period, was produced by ATF in <u>NAACP v. Acusport Corp.</u>, CV-99-7037[2]. Much of the data requested was produced without limitation on its use in that or any other proceeding. Certain other data elements were designated as Confidential Information that was produced subject to the terms of a Protective Order. The Protective Order, <u>inter alia</u>, provided access of the subject confidential information only to certain representatives of the <u>NAACP</u> parties and limited use of the data to the <u>NAACP</u> case only, and in no other proceedings. The Protective Order expressly recognizes the sensitivity of the disclosed data -- defined, at    ¶ 2, as "Confidential

---

[2]    The protective order is reported at 210 F.R.D. 268, 429-445 (E.D.N.Y. 2000).

Information" -- and upholds ATF's law enforcement privilege. See Protective Order, at ¶ 1; NAACP v. Acusport, 210 F.R.D. 268, 430 (E.D.N.Y. 2002) (Weinstein, J.). In fact, "the court [found] that the public disclosure of such trace database information, other than that currently released under the Freedom of Information Act, would reasonably be expected to seriously jeopardize criminal investigations and place at risk the physical safety of investigating law enforcement officers, informants, cooperating witnesses, suspects and others." Id. The Protective Order also acknowledges that ATF had never before disclosed Confidential Information to non-law enforcement personnel. Id. Accordingly, the Protective Order provides that "production of such non-public ATF information shall only be made subject to the terms of this Order of Protection . . ." Id. The Protective Order also provides that the individuals to whom the trace data was disclosed could not "reveal the identity of any persons referenced in the" data "or the particulars of any information regarding a criminal investigation referenced in the" data. Id. at 431.

The Protective Order states that Confidential Information can be disclosed only to Excepted Persons; that Excepted Persons can use Confidential Information in the NAACP case alone; and that at the end of the NAACP case all copies of

Confidential Information must be returned to ATF. NAACP, 210
F.R.D. at 430-31, 445.

**C.    Use Of Confidential Information At the NAACP Trial**

After the Protective Order was signed, ATF worked with
the parties' experts and, at considerable time, expense and
burden, formatted the Confidential Information on diskettes
provided to Excepted Persons.  The diskettes were revised, at the
parties' requests, several times - again at considerable cost,
expense and burden to ATF.  ATF performed all of its obligations
under the Protective Order and continued to cooperate in good
faith with the court and the parties throughout the entire trial
of this action.

In accordance with the Protective Order, trace data,
without the protected identifying information, was disclosed to
public at the trial at NAACP. The trace data was conveyed in
testimony by expert witnesses and incorporated into exhibits for
the public record. Trace data was included, _inter_ _alia_, in three
exhibits prepared by expert witnesses: (a) a list that set forth
the number of guns sold by certain dealers that were recovered by
the law enforcement in New York State; (b) a chart listing the
names of over 1500 gun dealers and the number of traces
associated with each dealer; and (c) a list setting forth, for
certain manufacturers, the average number of guns traced per year

for each manufacturer and the percentage of all traces attributable to each manufacturer.[3]

To the best of ATF's knowledge, at trial, no Confidential Information was disclosed or provided to the court, or the advisory jury.  It was not referred to in any trial exhibit or mentioned in any testimony.  Instead, as required by the Protective Order, it was used only "to compile [and contest] statistics, analyses, extrapolations and other studies -- all regarding the distribution of firearms which were the subject of a trace request."  The parties' experts testified and certain exhibits were introduced setting forth permissible statistical studies and conclusions derived from the Confidential Information; none of which disclosed the underlying Confidential Information.

After the court issued a decision, the NAACP appealed and defendants, although found not liable (because the NAACP did not have standing to bring the claims at issue), cross-appealed to expunge certain adverse factual findings made against them. The NAACP withdrew its appeal in October 2003.  The NAACP defendants' cross-appeal remains pending and thus the NAACP parties are still in possession of Confidential Information,

---

[3]   Due to the 2004 Appropriations Act, discussed infra, ATF cannot now disclose trace data and thus cannot be any more specific as to the nature of the trace data disclosed to the public at the trial in NAACP.

although they may not use it in any other proceedings, including
the instant proceedings.

**D.    The Instant Subpoenas**

    In a brief dated April 2, 2004, plaintiff Smith
requested that the Protective Order in NAACP be amended to allow
the parties to the Wendy's action to have access to the
Confidential Information. Smith Brief, dated April 2, 2004 at 4-
5.  The Confidential Information covers the years 1989 through
2000, which was the year that the Wendy's shooting took place.
Plaintiff Johnson likewise requested that the Protective Order be
amended, but also requested that ATF produce tracing information
through May 31, 2002, which is two years after the Wendy's
shootings. Smith Brief dated April 2, 2004 at 2-3. By letter to
the Court dated April 5, 2004, the City of New York requested
that the Protective Order be amended to allow the parties to the
City action to have access to the Confidential Information and
also requested that ATF produce tracing information through
January 31, 2004.

    On April 15, 2004, after Judge Weinstein issued his
decision denying motions to amend the Protective Order, plaintiff
Smith served a subpoena upon ATF, in which she demanded
production of the tracing information covered by the Protective
Order in NAACP. Plaintiff Smith also demanded production of
certain federal firearms licensing data which ATF produced in

NAACP, and which is not subject to the Protective Order or any other restrictions on dissemination or use.  On April 19, 2004, plaintiff City of New York served upon ATF a subpoena demanding production of tracing data for the period 1989 through the present and federal firearms licensing data for the period 1989 through the present. Plaintiff Jacquione Johnson issued a subpoena, dated April 21, 2004, which called for production of, inter alia, trace data and multiple sales data for defendants Atlantic Gun & Tackle Inc. and Acusport Corporation.

The subpoenas seek the production of, inter alia, three types of material - trace data, multiple sales data and records required to be kept pursuant to 18 U.S.C. § 923(g). "Trace data", as mentioned above in Part IA above, refers to information reported by firearms dealers to ATF for firearms tracing purposes pursuant to 18 U.S.C. § 923(g)(7). See Declaration of David Benton, Appendix B to ATF's Letter to the Magistrate Judge dated May 5, 2004, ¶¶ 9-10. "Multiple sales data" refers to reports that federally licensed firearms manufacturers, distributors and retailers ("federal firearms licensees", or "FFL's") are required to prepare pursuant to 18 U.S.C. § 923(g)(3) whenever they sell two or more pistols or revolvers within any five consecutive business days to a person who is not an FFL. Id., ¶ 11. The records required to be kept by FFL's pursuant to § 923(g) ("FFL records") include, inter alia, records concerning the

acquisition and disposition of firearms by the FFL's that are continuing in business; and records concerning the acquisition and disposition of firearms ("out of business information") by FFL's which have discontinued business. An out-of-business FFL is required to forward out of business information to ATF or other law enforcement agencies. See 18 U.S.C. § 923(g)(4). Although FFL's that are continuing in business generally do not provide FFL records to ATF, ATF does take possession of such records under certain circumstances, e.g., if ATF is conducting an inspection of the FFL.[4]

### E.    The Order of the Magistrate Judge

ATF moved to quash the subpoenas and to vacate the informal discovery request of plaintiff Johnson. ATF contended that due to a Congressional appropriation restriction contained in the 2004 Appropriations Act, enacted after the production of documents pursuant to the Protective Order in NAACP, ATF could not produce any trace data, multiple sales data or FFL records, including the type of trace data that had been produced pursuant to the Protective Order. ATF also argued, in the alternative, that even if the 2004 Appropriation Act were inapplicable, the information sought by the plaintiffs was subject to the law enforcement privilege and could be disclosed only pursuant to an

---

[4] The term "FFL records", as used herein, does not refer to the names, addresses and license numbers of FFL's. ATF does not contend that this information is shielded from discovery.

appropriate protective order.  In an Order dated May 19, 2004, the magistrate judge ordered that the 2004 Appropriations Act and the law enforcement privilege did not preclude production of the trace data, multiple sales data and FFL records pursuant to a confidentiality order. Order at 28-31. The magistrate judge also held that the Wendy's plaintiffs were not entitled to any data for years after 2000, the year in which the Wendy's shooting took place. Order at 32-22. The magistrate judge also deferred ruling on the Johnson subpoena, to the extent that the subpoena sought production of ATF "inspection records" and "demands" for defendants Atlantic Gun & Tackle Inc. and Acusport Inc. Order at 36, fn. 23. The magistrate judge also deferred ruling on a second subpoena prepared by plaintiff Smith, which had not been served on ATF as of the date of the Order. Order at 35-36.

<u>**ARGUMENT**</u>

**ATF IS BARRED BY LAW FROM EXPENDING
ANY FUNDS TO DISCLOSE FIREARMS
TRACE,  MULTIPLE SALES DATA OR
<u>OUT OF BUSINESS INFORMATION</u>**

Pursuant to 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a), a magistrate judge's ruling concerning a discovery matter may be reversed if it is "clearly erroneous or contrary to law."  A magistrate judge's discovery order is contrary to law if the order misapplies relevant law concerning privileges or other limitations on discovery. <u>See</u>, <u>e.g.</u>, <u>Buhlmann v. Ulster County</u>, 194 F.R.D. 445, 448 (N.D.N.Y. 2000)(vacating

magistrate judge's decision that the plaintiff had waived the psychotherapist-patient privilege); <u>Fullerton v. Prudential Insurance Co.</u>, 194 F.R.D. 100, 103 (S.D.N.Y. 2000)(reversing in part magistrate judge's ruling that the defendant had waived the work product privilege).  As demonstrated below, the magistrate judge misapplied a Congressional directive which prohibits ATF from turning over trace data, multiple sales data and FFL records.

A.     **The Appropriations Law Restrictions On ATF**

On February 20, 2003, President Bush signed into law the Consolidated Appropriations Resolution of 2003, Pub. L. No. 108-7, 117 Stat. 11 ("the 2003 Appropriations Resolution"). Section 644 of that law provides:

> No funds appropriated under this Act or any
> other Act with respect to any fiscal year
> shall be available to take any action based
> upon any provision of 5 U.S.C. § 552 with
> respect to records collected or maintained
> pursuant to 18 U.S.C. §§ 846(b), 923(g)(3),
> or 923(g)(7),[5] or provided by Federal, state,
> local, or foreign law enforcement agencies in
> connection with arson or explosives incidents
> or the tracing of a firearm, except that such
> records may continue to be disclosed to the
> extent and in the manner that records so
> collected, maintained, or obtained have been
> disclosed under 5 U.S.C. § 552 prior to the
> date of the enactment of this Act.

_____

[5]  18 U.S.C. § 846(b) authorizes the Secretary of the Treasury "to establish a national repository of information on incidents involving arson and the suspected criminal misuse of explosives." This information is not at issue.

The 2003 Appropriations Resolution prohibits ATF from using funds appropriated "under this Act or any other Act with respect to any fiscal year" to take any action to make multiple sales and firearms trace data available in response to a request made under the Freedom of Information Act ("FOIA"); i.e., 5 U.S.C. § 552, except as provided in the appropriations provision. (That exception is not applicable here).

On January 23, 2004, Congress enacted the Consolidated Appropriations Act of 2004, Pub. L. No. 108-199, 118 Stat. 3 (2004), codified as amended at 28 U.S.C. 530C ("the 2004 Appropriations Act").  It provides in relevant part that:

> no funds appropriated under this or any other Act may be used to disclose to the public the contents or any portion thereof of any information required to be kept by licensees pursuant to section 923(g) of title 18, United States Code, or required to be reported pursuant to paragraphs (3) and (7) of section 923(g) of title 18, United States Code, except that this provision shall apply to any request for information made by any person or entity after January 1, 1998.

The 2004 Appropriations Act expands the prohibition of disclosure.  The 2003 Appropriations Resolution is limited to use of appropriated funds to take any action under FOIA with respect to  firearms trace or multiple sales "records."  The 2004 Appropriations Act does not refer to disclosures or demands made under FOIA, but rather imposes a blanket prohibition on disclosure to the public of the specified information.

Furthermore, the  information covered by the 2004 Appropriations Act includes not only trace data and multiple sales data, but also the FFL records.[6]  By enacting the 2004 Appropriations Act, Congress clearly intended to broaden the prohibition on disclosure to include disclosure during the course of discovery in a civil action.

The legislative intent underlying the 2003 Appropriations Resolution and 2004 Appropriations Act is to limit ATF's ability to be compelled to disclose, trace data, multiple sales records and FFL records. The legislative history of the 2003 Appropriations Resolution supports this intent.  Congress plainly was:

> concerned that certain <u>law enforcement</u> databases may be subject to public release under the Freedom of Information Act (FOIA). As a result, information collected and maintained by ATF related to ongoing criminal investigations of firearms, arson or explosive offenses could be released, potentially compromising those cases.  What is a greater concern is that such release could be accomplished on a comprehensive basis, making all such data available to the public.  The need to maintain these databases

---

[6]   Requests for trace data submitted to ATF by law enforcement agencies, which include the make, model and serial number of firearms submitted for tracing by the agencies, fall outside the scope of the restriction contained in the 2004 Appropriations Act, because this information is not submitted by an FFL or derived from records maintained for an FFL pursuant to § 923(g). However, the trace data submitted to ATF by the FFL, which includes the identities of the FFL's in the distribution chain of traced firearms, are based on records maintained by FFL's and therefore clearly fall within the scope of the restriction.

> on a limited confidential basis that has been
> in place at ATF for several years for tracing
> records derives from the long-term nature of
> criminal investigations.  In addition to
> jeopardizing criminal investigations and
> officer safety, such information, once
> released, might easily be disseminated
> through the Internet.  This would not only
> pose a risk to <u>law enforcement</u> <u>and homeland</u>
> <u>security</u>, but also to the privacy of innocent
> citizens.  The Committee therefore includes
> language (Section 644) ensuring that no
> appropriated funds may be available to ATF to
> take any action under the FOIA with respect
> to such <u>law enforcement</u> records, except that
> disclosure of information collected or
> maintained under 18 U.S.C. §§ 846(b), 923(3)
> or 923(g)(7) or from Federal, State, local or
> foreign law enforcement in connection with
> arson or explosives incidents or the tracing
> of a firearm may continue in accordance with
> long standing agency practice. [Emphasis
> added][7]

This statement of legislative intent also applies to

the 2004 Appropriations Act, which was enacted less than a year

later.  Indeed, by expanding the prohibition beyond ATF's

disclosure obligations under FOIA, the 2004 Appropriations Act

evinces a heightened intent to bar compulsory disclosure to

members of the public. Read in the light of the 2003

Appropriations Resolution, the 2004 Appropriations Act clearly

---

[7]   H.R. Rep. No. 575, 107th Cong., 2d Sess. 20 (2002) (to
accompany H.R. 5120)("House Report").  <u>See</u> H.R. Conf. Rep. No.
108-10, at 466 (2003), <u>reprinted</u> in 149 Cong. Rec. H707, H831
(daily ed. February 12, 2003) (the Conference Committee, agreeing
with the House proposal, stated that "[t]he conferees agree to
include a new provision prohibiting the use of funds to
facilitate the release of certain <u>law enforcement database</u>
<u>information</u> in response to requests made under the Freedom of
Information Act") (emphasis added).

bars ATF from disclosing to the public the trace data, multiple sales data and the FFL records.

Congress acted to prohibit the public disclosure of this material because of the sensitive nature of the material and the great harm to law enforcement and to national security that would result from such disclosure. Indeed, the chief law enforcement officer of the City of New York -- one of the plaintiffs that is requesting production of trace data in this case -- has recognized the need to protect the confidentiality of trace data. Raymond W. Kelly, the Police Commissioner of the City of New York, in a letter to Attorney General John Ashcroft dated August 19, 2002 stated:

> Law enforcement agencies at every level rely on the ATF's tracing system and resources to advance critically important investigations. The use of these traces has resulted in the successful closure of many criminal investigations, the conviction of numerous dangerous firearms offenders, the recovery of thousands of illegal firearms from unlicensed possessors, and the dismantling of many insidious and violent criminal organizations.

Kelly Letter, Appendix A hereto at 1.[8]

Commissioner Kelly also forcefully described the harm that would result from the release of trace data:

> The release of trace information ... seriously jeopardizes not only the

---

[8]   This letter was presented to the Magistrate Judge as Appendix A to the Supplemental Memorandum of ATF dated April 30, 2004.

> investigations, but also the lives of law
> enforcement officers, informants, witnesses
> and others. Even when this information does
> not identify specific individuals who may be
> endangered, merely disclosing that a trace
> was conducted may be enough to create a grave
> threat to life, to result in the flight of
> the suspects or the destruction of evidence,
> or to otherwise compromise investigations in
> which law enforcement agencies have invested
> so much.

Kelly Letter at 2. Commissioner Kelly also warned that the mere

possibility that trace data would be released could cause some

agencies to discontinue or curtail their use of the trace data,

thereby seriously undermining "the effectiveness of the overall

trace system." Id.

The City of New York has also, in an agreement with

ATF, recognized that the trace data includes law enforcement

sensitive information, including the name of the federal firearms

licensees in the distribution chain of traced weapons. Pursuant

to the Youth Crime Gun Interdiction Initiative, a concentrated

initiative to reduce firearms violence by youths, ATF has entered

into memoranda of understanding with over fifty cities.  On July

21, 2003,  the New York Police Department (NYPD), by Commissioner

Kelly, entered into a Youth Crime Gun Interdiction Initiative

Memorandum of Understanding with ATF ("the NYC MOU"). In the NYC

MOU, NYPD agreed that the trace data contains sensitive

information and should not be disclosed to third parties without

the consent of both NYPD and ATF:

> The parties agree that the premature
> disclosure of certain firearms trace
> information can reasonably be expected to
> interfere with pending or prospective law
> enforcement proceedings. This law enforcement
> sensitive information includes data that can
> link a traced firearm to: the location of a
> crime, the Federal firearms licensee; retail
> purchaser or possessor of a traced firearm;
> or to firearms trafficking patterns involving
> a traced firearm. It is agreed that the law
> enforcement firearms trace information
> generated pursuant to this Agreement shall
> not disclose [sic] to a third party without
> the consent of ATF and NYPD.

NYC MOU, Appendix B hereto, at 2 (emphasis added).[9] Thus, NYPD

has clearly expressed its concern that this data not be disclosed

to the public by any means, including without limitation, FOIA

and subpoena.

There is no dispute that the material covered by the

2004 Appropriations Act includes the trace data, the multiple

sales data and the FFL records. The primary issue is whether

disclosure of this material pursuant to an NAACP-type protective

order would constitute a "disclos[ure] to the public" in

violation of the 2004 Appropriations Act.

Under the protective order in NAACP, some of the

material data produced was "disclose[d] to the public" in a

manner that would have violated the 2004 Appropriations Act, had

the Act been in effect at the time of the disclosures in NAACP.

---

[9]   This letter was included as Appendix D to the letter brief
dated May 8, 2004  of ATF to the magistrate judge.

Therefore, due to the enactment of the 2004 Appropriations Act, ATF is not at liberty to consent to an NAACP-type protective order and the Court cannot direct ATF to produce material in accordance with such an order.  The Protective Order provided that the trace data would be disclosed to certain attorneys and experts who would use the information to "compile statistics, analyses, extrapolations and other studies – all regarding the distribution of firearms which were the subject of a trace request" as long as these individuals did not "reveal the identity of any persons referenced in the" data "or the particulars of any information regarding a criminal investigation referenced in the" data.  NAACP v. Acusport Corp., 210 F.R.D. 268, 431 (E.D.N.Y. 2002).

Trace data was included, inter alia, in three exhibits prepared by  expert witnesses in NAACP: (a) a list that set forth the number of guns sold by certain dealers that were recovered by the law enforcement in New York State; (b) a chart listing the names of over 1500 gun dealers and the number of traces associated with each dealer; and (c) a list setting forth, for certain manufacturers, the average number of guns traced per year for each manufacturer and the percentage of all traces attributable to each manufacturer. The trace data introduced as evidence in NAACP was revealed both to the jury that heard the case and to all spectators who observed the trial.

The 2004 Appropriations Act, _inter_ _alia_, prohibits the use of federal funds to "disclose to the public" the trace data, multiple sales data and FFL records  "or any portion thereof" (emphasis added).  If ATF were to produce this material pursuant to an NAACP-type protective order, then a "portion" of the material – _i.e._, the portion of the material that does not reveal individual identities or ongoing criminal investigations – would be disclosed on the public record to the jury and spectators at trial. The transcript of the trial, which would contain testimony revealing, and exhibits containing, this material, would be maintained on public file with the Clerk of the Court and thus could be disclosed to any person who wishes to review the Clerk's file. These disclosures, resulting from ATF's expenditure of appropriated funds, would constitute a "disclos[ure] to the public" prohibited by the 2004 Appropriations Act. [10]

This conclusion is consistent with Second Circuit case law on the definition of the term "public disclosure" as it

_____

[10]  The magistrate judge also stated that testimony or exhibits reflecting the data and records would likely "primarily contain analyses and summaries of the data, rather than the underlying data itself." Order at 16 (emphasis added). Thus, the magistrate judge recognized that at least some of the testimony and exhibits would consist of raw data. Any implication by the magistrate judge that disclosure of the analyses and summaries of the data and records would not violate the 2004 Appropriations Act is incorrect. Any summary or analysis of the data and records that is disclosed in open court would constitute, at a bare minimum, a public disclosure of a "portion" of the data and records, in violation of the Act.

appears in the False Claims Act, 31 U.S.C. § 3729 et seq. (FCA).
Title 31 U.S.C. § 3730(e)(4) generally deprives federal courts of
subject matter jurisdiction over FCA qui tam actions based upon
the "public disclosure" of the underlying allegations or
transactions in trials and hearings, but does not define the term
"public disclosure."  In United States ex rel. Kreindler &
Kreindler, 985 F.2d 1148 (2d Cir. 1993), the plaintiff, an
attorney, brought an FCA action based on transactions which had
been revealed in documents produced during the course of
discovery in a prior state court action, in which the plaintiff
had represented one of the parties.  The documents were produced
pursuant to a protective order, but were subsequently filed with
the state court, without any sealing or protective order. The
Second Circuit held that the information contained in the
documents "was publicly disclosed because it was available to
anyone who wished to consult the court file." Id. at 1158.
Accord, United States ex rel. Huangyan Import & Export Corp.,
2004 WL 74310 (S.D.N.Y. 2004) (dismissing action based on
information contained in a complaint filed in a prior action, as
the underlying information had been publicly disclosed).

        Production of the requested trace data, multiple sales
data and FFL records by ATF in this case pursuant to an NAACP-
type protective order would likewise lead to a "disclos[ure] to
the public" of portions of the data and records that do not

involve identification of individuals and criminal investigations. As in Kreindler, the transcripts of the testimony containing this data and information would be on file with the Clerk of the Court, and thus would be available to the public. Furthermore, the data and records would be disclosed in open court to the jury and spectators, who would not be subject to any restrictions on use or further dissemination of the data and records. Indeed, since the instant cases have attracted media attention -- the magistrate judge's Order was the subject of articles in the New York Times and the New York Law Journal (see Appendix C hereto) -- it is likely that news reporters and other media representatives will be present among the spectators at trial. News reporters and media representatives, in addition to other members of the public, will also have unfettered access to, and may review, the court files in these actions. The disclosure of the data and records to all persons present during trial and to any member of the public who "wishe[s] to consult the court file" thus constitutes a "disclos[ure] to the public" for purposes of the 2004 Appropriations Act. Kreindler, 985 F.2d at 1158.[11]

---

[11] It is also likely that material introduced as evidence at the trials in these actions will be published on the Internet. Exhibits containing trace data that were introduced at trial in NAACP were used by the Americans for Gun Safety Foundation (AFGSF) in its publication, Selling Crime: High Crime Gun Stores Fuel Criminals (January 2004). This publication may be viewed,

(continued...)

The magistrate judge rejected ATF's position by stating that testimony or exhibits that contain trace data, multiple sales data and FFL records "could be sealed", thus preventing a disclosure to the public. Order at 16.[12]  However, any such sealing order would pose grave constitutional concerns, which the magistrate judge did not even acknowledge. The Second Circuit has recognized that "the First Amendment does secure to the public and to the press a right of access to civil proceedings." Westmoreland v. Columbia Broadcasting System Inc., 752 F.2d 16, 23 (2d Cir. 1984). See also ABC Inc. v. Stewart, 360 F.3d 90, 105 (2d Cir. 2004)(criminal proceedings generally must remain open to the press; vacating in part district court order barring the press from attending voir dire examinations of potential jurors in a criminal case). A sealing order in the City action would raise especially grave constitutional questions. The public interest in access to all exhibits and proceedings in that action is especially great because, as this Court has recognized, that action involves issues of great public concern:

---

[11](...continued)
without charge, on the AFGSF website.

[12]  ATF did not seek from the magistrate judge an order restricting access to any exhibits or testimony and is not now seeking such an order. Attorneys for the United States generally may not move for, or consent to, the closure of a judicial proceeding, and may do so only with the permission of the Deputy Attorney General or the Associate Attorney General. See 28 C.F.R. § 50.9.

> Here, one of the world's great cities is
> challenging the international handgun
> industry's practices that are alleged to put
> at unnecessary risk millions of urban
> residents. <u>The precedential value and impact
> of such a case is likely to be substantial</u>.

<u>City of New York v. Beretta</u>,     F. Supp. 2d     , 2004 WL
1050875 at *3 (E.D.N.Y. May 11, 2004)(Weinstein, J.)(denying
motion to strike the defendants' jury demand) (emphasis added).
In addition, in light of the press coverage that these actions
have received, it is very likely that any order barring public
and press access to testimony and trial exhibits would be opposed
by media outlets, thereby giving rise to additional litigation.

Even assuming <u>arguendo</u> that this Court could
constitutionally bar public and press access to all testimony and
exhibits reflecting trace data, multiple sales data and FFL
records, production of the data and records would nonetheless
violate the 2004 Appropriations Act. The data and records
reflected in the testimony and exhibits would be disclosed to the
members of the jury. Such disclosure would constitute a
"disclos[ure] to the public." <u>United States ex rel. John Doe v.
John Doe Corp</u>., 960 F.2d 318, 322 (2d Cir. 1992).  In <u>John Doe</u>,
FBI agents investigating fraud by a military contractor disclosed
information concerning the fraud to individuals who were not
involved with the fraud, and "were under no obligation to keep
this information confidential." <u>John Doe</u>, 960 F.2d at 323. The

Second Circuit held that this disclosure constituted a "public disclosure" for purposes of the FCA. John Doe, 960 F.2d at 323.

In the instant cases, if the magistrate judge's Order were affirmed, the trace data, multiple sales data and FFL records would be disclosed to the jurors during the course of the trials of these cases. The jurors would be under no obligation to keep this material secret.  It is not possible for a court to craft a protective order preventing jurors from disclosing this material the way that a court could craft a protective order preventing an attorney or an expert witness from disclosing this material. See Loral Corporation v. McDonnell Douglas Corporation, 558 F.2d 1130, 1132 (2d Cir. 1977)(courts are unable to insure juror compliance with an order not to disclose evidence introduced at trial; conducting security background checks on jurors is also not feasible).  Over the past decade, jurors have routinely, and without punishment, disclosed information about their deliberations to the media.  Thus, the disclosure of the trace data, multiple sales data and FFL records to the juries would constitute a "disclo[sure] to the public" prohibited by the 2004 Appropriations Act. John Doe, 960 F.2d at 323.

The magistrate judge also rejected ATF's position by holding that Congress, in the 2004 Appropriations Act, did not specifically mention that disclosures for purposes of litigation were included in the prohibition. Order at 13-14, 21-23. Yet

Congress was not required to specifically enumerate each and every type of disclosure that is prohibited by the 2004 Appropriations Act. Indeed, if Congress were required to do so, then the Act would have no effect whatsoever, since the Act does not mention any specific type of disclosure, e.g. disclosure pursuant to FOIA or disclosure pursuant to subpoena. [13]

The magistrate judge also held that the legislative history of the 2004 Appropriations Act did not show a legislative intent to bar disclosure pursuant to subpoena for purposes of litigation. Order at 21-24. The magistrate judge's reliance on legislative history was erroneous, because the plain meaning of the 2004 Appropriations Act is clear on its face. Lamie v. United States Trustee,    U.S.    , 124 S. Ct. 1023, 1031 (2004); McHugh v. Rubin, 220 F.3d 53, 58, fn.2 (2d Cir. 2000). The Act's prohibition on "disclos[ure] to the public" is unambiguous and on its face applies to all disclosures. Had Congress wished to prohibit only certain types of disclosures, e.g. disclosures pursuant to FOIA, then Congress would have used the language similar to that used in the 2003 Appropriations Resolution, which was expressly limited to FOIA disclosures. By barring all

---

[13] The magistrate judge also cited Equal Employment Opportunity Commission v. Associated Dry Goods Corp., 449 U.S. 590, 598 (1980). Order at 13. That decision is inapposite, because it dealt with the disclosure of information to the party that provided it to the Government. The plaintiffs did not provide to ATF the material at issue here.

"disclos[ure] to the public" of the subject information, rather than just one or more types of public disclosure, as it did in the 2003 Appropriations Resolution, Congress, in the plain wording of the 2004 Appropriations Act, clearly demonstrated its intent to bar all types of disclosure, including disclosure pursuant to subpoena.

Furthermore, even assuming arguendo that resort to legislative history was proper – and it was not – the legislative history makes it clear that Congress understood that the 2004 Appropriations Act barred all disclosure of the subject information.  In discussing the Act, Senator McCain made no mention of FOIA or any other type of disclosure. Senator McCain correctly noted that the Act "prohibits the release" of the subject information and stated that under the Act, the government would "refuse[] to release" this information.  150 Cong. Rec, S66-02 at S87.

In addition, Senator Mikulski expressly recognized that the prohibition on disclosure would apply to disclosures in the context of litigation. The magistrate judge stated that it is not clear whether Senator Mikulski was referring to the prohibition on disclosure or to a provision on recordkeeping contained in the Act. Order at 23-24. In fact, Senator Mikulski's comments clearly demonstrate her understanding that both the prohibition on disclosure and the recordkeeping provision -- which she

collectively described as "rollbacks" -- would affect litigation against manufacturers and distributors of firearms:

> The Omnibus also rolls back existing gun laws and ties the hands of law enforcement. The Brady law requires that gun records be held for 90 days, yet this bill allows Government to destroy records after only 24 hours. These records are kept for a reason – to help law enforcement track down weapons and to keep law breakers from buying guns. The rollback provision also blocks the public from seeing critical information, even if they were the victim of a gun crime. <u>If these rollbacks were in place last year, families of the DC sniper victims would not be allowed to know where the sniper got his gun and the questionable practices of the gun shop. Without this information, they would effectively be denied their day in court.</u>

150 Cong. Rec. S66-02 at S103. (emphasis added).

Accordingly, the 2004 Appropriations Act clearly and unambiguously prohibits ATF from spending any funds to disclose to the public even portions of trace data, multiple sales data and FFL records. ATF therefore cannot produce this material for the express purpose of having the data disclosed, even in part, at trial.

**B.   <u>ATF Cannot Use Non-Appropriated Funds</u>**

The magistrate judge held, in the alternative, that even if the 2004 Appropriations Act applies to disclosures pursuant to subpoena, the 2004 Act would not forbid ATF from disclosing information if the necessary expenditures are paid to

ATF by the plaintiffs. Order at 28-29, fn. 19. This alternative holding is incorrect.

ATF may not use any fees for any purpose unless they are specifically appropriated. Thus, even if plaintiffs were to pay fees for ATF's disclosure of firearms trace and multiple sales information, under 31 U.S.C. § 3302(b), such funds would have to be deposited in the Treasury, and under the Appropriations Clause of the Constitution (Article I, Section 9, Clause 7) and the Anti-Deficiency Act (31 U.S.C. § 1341), money may not be drawn from the Treasury unless it has been appropriated by an Act of Congress.[14]  See OPM v. Richmond, 496 U.S. 414, 424-25 (1990) ("Money may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by a statute." See also Scheduled Airlines Traffic Offices, Inc. v. Department of Defense, 87 F.3d 1356, 1361 (D.C. Cir. 1996) ("By requiring government officials to deposit government monies in the

_____

[14]  31 U.S.C. 3302(b) provides that "[a]n official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim" (emphasis added).  The Appropriations Clause (Article I, Section 9, Clause 7) provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."   The Anti-Deficiency Act (31 U.S.C. 1341(a)(1)) provides that "[a]n officer or employee of the United States Government * * * may not  make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation."

Treasury, Congress has precluded the executive branch from using such monies for unappropriated purposes").

Thus, any fees that ATF might collect from plaintiffs could not be retained or used by ATF to defray the costs of disclosing information covered by the 2004 Appropriations Act, but must instead be deposited in the Treasury.  Any costs involved in releasing additional trace and multiple sales information would therefore necessarily require the expenditure of ATF's appropriated funds which has been expressly barred by the Appropriations Act of 2004.

The magistrate judge cited several cases for the proposition that "courts often award costs to the government as a result of a discovery sanction ... or as reimbursement for the costs of producing documents in criminal cases." Order at 28, fn. 19. These cases are inapposite, because none of them involved Congressional restrictions on expenditures. Premises Known as 225, 1468 and 1470 Statler Towers v. United States, 787 F.2d 796, 798 (2d Cir. 1986); Horsely v. United States, 1985 WL 2655 (N.D. Cal. 1985).

Further, any attempt to circumvent the appropriations bar would fly in the face of the clear intent of Congress.  The unambiguous language of the Appropriations Act of 2004, as well as its legislative history, demonstrate that Congress intended to prohibit the release of certain law enforcement records,

including those at issue here, not merely to shift costs by requiring persons who request the material to reimburse ATF for the costs of disclosure.  Rather, Congress acted to prevent the release of the protected material because of the "risk to law enforcement and homeland security * * * [and] the privacy of innocent citizens" that would be put in jeopardy by disclosure of the databases.  See House Report at 20.

Had Congress desired only to shift the costs of releasing the material, Congress would have included language permitting reimbursement of costs that Congress used elsewhere in the 2004 Appropriations Act. In the portion of the 2004 Appropriations Act relating to the Department of Veterans Affairs, Congress provided that no funds could be used to pay for medical care of certain persons "unless reimbursement of cost is made ... at such rates as may be fixed by the Secretary of Veterans Affairs." 2004 Appropriations Act § 104, 118 Stat. 3 (emphasis added).  The absence of any language concerning reimbursement in the 2004 Appropriations Act provision at issue here demonstrates that Congress intended to prohibit release of the trace data, multiple sales data and FFL records and not merely to conserve governmental resources.

Congress may affect substantive rights and legislate through appropriations measures.  In McHugh v. Rubin, 220 F.3d 53 (2d Cir. 2000), reversing 49 F. Supp. 2d 105 (E.D.N.Y. 1999), the

plaintiff, a convicted criminal, sought to compel ATF to act upon his request, pursuant to 18 U.S.C. § 925(c), to restore his federal firearms privileges.  ATF did not process the application or otherwise act on it because Congress prohibited ATF from using appropriated funds to do so.  The plaintiff sought a writ of mandamus to compel ATF to act or a plenary review of his application by the court.  The district court ordered a plenary review, holding that § 925 remained in effect and ATF's refusal to process the application was a de facto denial.  49 F.Supp.2d at 111.  The Second Circuit reversed, holding:

> ATF is under a statutory duty not to do the act in question. For each fiscal year since 1993, Congress has enacted an appropriations statute stating: "[N]one of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. [§ ]925(c)." Even the simple act by the ATF of processing applications in accordance with a straightforward categorical rule (for example, "all applications shall be denied") would involve the use of appropriated funds. The ATF has been placed in a virtual straightjacket by the plain language of Congress's appropriations statutes precluding it from acting on § 925(c) applications.
>
> It is well established that Congress may repeal, amend or suspend a statute by means of an appropriations bill, so long as its intention to do so is clear . . . . Congress could not have stated more clearly that the ATF is prohibited from acting on applications submitted by individuals pursuant to § 925(c). The parties have not suggested that the ATF has access to any funds other than those affected by the relevant spending

> limitation, nor are we aware of any such
> funds. Thus, while the annual appropriations
> statutes speak in terms of the ATF's ability
> to spend appropriated funds, their effect on
> the agency is obvious: It may neither grant
> nor deny applications falling within the
> scope of the funding restriction. We
> therefore conclude that Congress's intent to
> suspend the ATF's ability to act on
> applications submitted by individuals
> pursuant to § 925(c) is "clear and manifest."

Id., 220 F.3d at 57-58.

Similarly, in Environmental Defense Center v. Babbitt, 73 F.3d 867 (9th Cir. 1995), the Endangered Species Act provided that the Secretary of the Interior "shall" act on a proposed rule to list a species as endangered within one year of the date of its publication.  This provision was a mandatory, nondiscretionary duty which could be enforced under the statute by citizen suit. Id. at 870.  However, an appropriations rider provided that "none of the remaining funds appropriated under that heading may be made available for making a final determination that a species is threatened or endangered." Id. at 869.  The Secretary of the Interior had completed the necessary scientific studies and field work to make a final determination, and the only action that remained to be taken was in-house review and decision-making.  The Ninth Circuit nonetheless concluded that the appropriations rider precluded the Secretary of the Interior from making a final determination. The Ninth Circuit held that "even though completion of the process

may require only a slight expenditure of funds, we agree with the Secretary that taking final action on the California red-legged frog listing proposal would necessarily require the use of appropriated funds. The use of any government resources  - - whether salaries, employees, paper or  buildings - - to accomplish a final listing would entail government expenditure." Id. at 871.  Thus, the Ninth Circuit concluded that because "[t]he government cannot make expenditures, and therefore cannot act, other than by appropriation . . . and because] no appropriated funds are available to the Secretary to make a final listing that a species is disabled . . . the Secretary may not take final action on the California red-legged frog listing proposal at this time."  Id.  at 872.

The magistrate judge, in holding that if plaintiffs were to pay ATF's expenses, there would be no violation of the 2004 Appropriations Act, relied on an earlier Ninth Circuit decision, Cal-Almond, Inc. v. Dept. of Agriculture, 960 F.2d 105 (9th Cir. 1992). Order at 28, fn. 19. The court in Cal-Almond held that a statutory provision barring the expenditure of appropriated funds to release certain information under FOIA did not prevent disclosure of the information, where the requester agreed to incur the costs of release of the documents. Cal-Almond, 960 F.2d at 108.  In its one-paragraph discussion of this issue, the Ninth Circuit panel in Cal-Almond did not directly

address the appropriations principles at stake here. The Ninth Circuit subsequently did so in <u>Environmental Defense Center</u>. In particular, as the Ninth Circuit held in <u>Environmental Defense Center</u>, the mere use of a government building or government paper or the time of a government employee to provide information in a manner proscribed by Congress would run afoul of the Congressional directive. <u>Environmental Defense Center</u>, 73 F.3d at 871.  Thus, the holding of <u>Cal-Almond</u> relied upon by the magistrate judge is inconsistent with more recent case law from the same court that decided <u>Cal-Almond</u>.

Even more significantly, <u>Cal-Almond</u> is contrary to the holding of the Second Circuit in <u>McHugh</u>. The Second Circuit held that "[e]ven the simple act by the ATF of processing applications in accordance with a straightforward categorical rule (for example, "all applications will be denied") would involve the use of appropriated funds." <u>McHugh</u>, 220 F.3d at 57. The time that ATF employees would have to spend in order to produce documents in response to  the subpoenas and discovery requests would likewise involve the use of appropriated funds in violation of the 2004 Appropriations Act. The amount of time that the ATF employees would have to spend would be considerable.  ATF estimates that it would take a computer technician three working days to compile the trace data requested by the City of New York. The computer technician would have to, <u>inter alia</u>, construct

parameters to access from the trace data base the information to be produced and download that information into a computer disk. ATF would have to spend additional time searching its records for other documents requested by plaintiffs, some of which are not computerized. In addition, ATF's Disclosure Division and its attorneys would have to review all materials data to ensure that the materials were subpoenaed by the parties and to ensure compliance with provisions of any protective order protecting law enforcement privileged material.

In addition, based on ATF's experience in NAACP, ATF would expend substantial amounts of time communicating with the parties in these cases after the production of trace data, multiple sales data and FFL records. The parties in NAACP required several hours of detailed explanation from ATF regarding the substance of the data produced on disk pursuant to the protective order as well as instructions on how to use the disk. ATF would almost certainly have to provide similar assistance in these cases, which include parties who were not parties in NAACP. Moreover, if the data and records were produced in these cases pursuant to a protective order, as suggested by the magistrate judge, personnel from ATF and the United States Attorney's Office will have to spend many hours to review proposed trial exhibits, to insure that the exhibits do not include law enforcement sensitive material. The magistrate judge herself suggested that

the protective order provide that ATF be given "an opportunity to lodge objections and seek court intervention". Order at 16. Thus, the cost of complying with the subpoenas would clearly not be de minimis and would involve considerable expenditure of time, money and other agency resources.

The magistrate judge also held that the costs of compliance with the subpoena and the informal discovery request "could come from Justice Department funds appropriated for general litigation activities." Order at 28, fn. 19.  This holding is contrary to the unambiguous language of the 2004 Appropriations Act, which applies to "funds appropriated under this or any other Act" (emphasis added). Thus, the prohibition on expenditures applies equally to all funds appropriated by Congress, not just funds appropriated for ATF's operations.

Here, Congress could not have expressed more clearly its intent to bar ATF from being legally compelled to disclose the information at issue.  Since "Congress's intent to suspend the ATF's ability to [disclose to the public the information at issue] is 'clear and manifest'", McHugh, 220 F.3d at 57, ATF is precluded from turning over the trace data, multiple sales data and the FFL records. [15] [16]

---

[15]  Both appropriations measures are currently in effect.  The Appropriations Resolution of 2003 is applicable with respect "to any fiscal year" (see GAO Principles of Federal Appropriations Law, 1999 WL 645712).  The Appropriations Act of 2004 only

(continued...)

C.   **The 2004 Appropriations Act Does Not Raise**
     **Any Constitutional Issues**

In support of her ruling, the magistrate judge also stated that the construing the 2004 Appropriations Act to preclude ATF to turn over documents pursuant to subpoena would raise a constitutional question, i.e., the Act would arguably be unconstitutional as an impermissible encroachment on the judiciary. Order at 17-19. The only case cited by the magistrate

---

[15](...continued)
applies to the current fiscal year, unless it is re-enacted for fiscal year 2005.

[16]   The magistrate judge also held that the Gun Control Act of 1968 ("GCA"), 18 U.S.C. § 921 et seq., "arguably provides an alternative basis for disclosure to the City." Order at 20, fn. 14. In fact, the provision of the GCA that authorizes certain disclosure, 18 U.S.C. § 923(g)(1)(D), and its implementing regulation, 27 C.F.R. § 478.25, are framed in permissive terms. Both provide that ATF "may" make available certain information. Further, the information that ATF "may" make available is very limited. Section 923(g)(1)(D) and § 478.25 deal solely with information regarding the identification of "prohibited persons", i.e., convicted felons, who have purchased or received firearms or ammunition.  The trace data , multiple sales data and FFL records that the plaintiffs seek is much broader, as it includes, inter alia, the names of FFL's which have manufactured and sold traced weapons. Furthermore, even assuming arguendo that any provision of the GCA could be construed as providing an alternative basis for disclosure of this material to any of the plaintiffs -- which is not conceded -- then ATF would nonetheless be precluded from providing such disclosure pursuant to the 2004 Appropriations Act. The 2004 Appropriations Act prohibits ATF from expending funds appropriated under "this or any other Act", thereby clearly prohibiting ATF from spending funds appropriated for GCA enforcement to provide the data and records to the plaintiffs.  McHugh, 220 F.3d at 58 (due to an expenditure prohibition contained in appropriations measures, ATF was not authorized to process applications for relief from firearms disabilities that are expressly provided for by statute).

judge to support this dictum, Universal Airlines, Inc. v. Eastern
Airlines, Inc., 188 F.2d 993 (D.C. Cir. 1951), actually
demonstrates that Congress does have the power to insulate a
federal agency's records from subpoena.

        In Universal Airlines, the district court ordered the
Civil Aeronautics Board ("CAB") to produce agency records.  On
appeal, the CAB contended that the district court could not
compel the CAB to produce any of its reports, orders, or private
papers.  The court of appeals agreed, holding, "[t]his contention
seems sound and supported by the authorities."  Id., 188 F.2d at
1000.  Accord, Chiron Corp. v. National Transp. Safety Bd., 198
F.3d 935, 941 (D.C. Cir. 1999)("the statute means what it says:
No part of the Board's actual report is admissible as evidence in
a civil suit"); In re Air Crash Disaster at Sioux City, Iowa, on
July 19, 1989,780 F.Supp. 1207, 1210 (N.D. Ill. 1991) ("Congress
plainly chose to serve its purpose of preventing NTSB data from
"usurp[ing] the function of the jury" by absolutely barring
admission of NTSB reports, while permitting limited testimony
from NTSB employees"); see also Armstrong v. Dwyer, 155 F.3d 211,
221 (3d Cir. 1998)(patient who claimed malpractice could not
subpoena documents concerning investigation into surgeon's
treatment by peer review organization ("PRO") that had contract
with Medicare because "Congress deemed that documents or
information produced by the PRO in connection with a quality

review study shall not be subject to subpoena or discovery"). Thus, <u>Universal Airlines</u> demonstrates that courts should respect Congressional prohibitions on disclosure of agency records pursuant to subpoena and in no way even hints that such prohibitions may be unconstitutional.[17]

Furthermore, enforcement of the prohibitions on disclosure contained in the 2004 Appropriations Act will not unduly prejudice any of the plaintiffs. The plaintiffs may make use of the exhibits introduced into the public record in <u>NAACP</u> that were derived from the trace data that ATF produced pursuant to the Protective Order. This trace data covers the period 1989 through 2000, the year of the Wendy's shooting, which is the period specified in plaintiff Smith's subpoena. Moreover, it is uncontested that the plaintiffs have access to certain trace data, <u>i.e.</u>, the identities of FFL's in the distribution chain of trace firearms, through December 31, 1997, which ATF disclosed to counsel for plaintiff Smith, in her capacity as counsel for the plaintiff in <u>NAACP</u>, prior to the enactment of the 2004 Appropriations Act.

_____

[17] The court of appeals in <u>Universal Airlines</u> also rejected the CAB's challenge to the district court's order that a CAB investigator testify at trial. <u>Universal</u>, 188 F.2d at 999-1000. This holding was not based on any constitutional principles. As the court of appeals noted, the CAB did not raise an objection before the district to the investigator's testimony and thus could not raise such an objection on appeal. <u>Id</u>.

Accordingly, the magistrate judge, in holding that ATF could be compelled to produce the trace data, multiple sales data and FFL records, misconstrued the 2004 Appropriations Act and misapplied well-settled law concerning expenditures by federal agencies. The magistrate judge's Order should therefore be reversed to the extent the order directs ATF to produce this material. Buhlmann, 194 F.R.D. at 448.

## CONCLUSION

The Order of the magistrate judge should be reversed, to the extent that the Order directed ATF to turn over trace data, multiple sales data and FFL records.

Dated:    Brooklyn, New York
          June 2, 2004

Respectfully Submitted

ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York
One Pierrepont Plaza, 14th Floor
Brooklyn, New York 11201

_Elliot M. Schachner_
ELLIOT M. SCHACHNER
VINCENT LIPARI
Assistant U.S. Attorneys
    (Of counsel)

APPENDIX   A



**THE POLICE COMMISSIONER**
CITY OF NEW YORK

August 19, 2002

Honorable John Ashcroft
United States Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Dear Mr. Ashcroft:

I am writing to express my concern about the possibility that firearms trace information compiled by the Bureau of Alcohol, Tobacco, and Firearms (ATF) tracing system might be released in ways that will compromise critical law enforcement investigations and endanger the lives of Police Officers and members of the public.

It is my understanding that the recent decision by the Seventh Circuit Court of Appeals (in the case of *City of Chicago v. United States Department of Treasury, Bureau of Alcohol, Tobacco and Firearms*) and the court's denial of a request for *en banc* rehearing, if allowed to stand, will permit contemporaneous, unredacted disclosure of firearms trace information to anyone who asks for it, including the very criminals who are under investigation. Such a result clearly would be catastrophic for law enforcement, would compromise national security, and would signal the end of the trace program, as law enforcement agencies would no longer be able to rely on the current ability to share critical information confidentially.

Law enforcement agencies at every level rely on the ATF's tracing system and resources to advance critically important investigations. The use of these traces has resulted in the successful closure of many criminal investigations, the conviction of numerous dangerous firearms offenders, the recovery of thousands of illegal firearms from unlicensed possessors, and the dismantling of many insidious and violent criminal organizations. The ability to trace firearms, therefore, has become an essential tool in conducting a wide array of critical and sensitive law enforcement investigations. The use of this resource by local and state agencies also is a dramatic illustration of the need for and benefits of a continuing, close, and confidential cooperative relationship with federal agencies to prevent and solve crimes.

The prospect that information obtained through these traces may be available for release by request to ATF under the Freedom of Information Act (FOIA) is therefore quite disturbing. Even more alarming is the possibility that this information might be released while the investigation remains open. The release of trace information under FOIA seriously jeopardizes not only the investigations, but also the lives of law enforcement officers, informants, witnesses, and others. Even when the information does not identify specific individuals who may be endangered, merely disclosing that a trace was conducted may be enough to create a grave threat to life, to result in the flight of the suspects or the destruction of evidence, or to otherwise compromise investigations in which law enforcement agencies have invested so much. The possibility that information concerning investigations may be released and used in these ways may, in fact, result in some agencies discontinuing - or at least curtailing - their use of the trace system. Thus, the effectiveness of the overall trace system, as well as the essential relationship of cooperation that has been cultivated between federal and local law enforcement, also would be seriously undermined.

Accordingly, in order to ensure that this information is not released inappropriately, and that the ability to conduct such traces remains a useful tool for all law enforcement agencies, I wholeheartedly support ATF's efforts to protect and preserve the confidentiality of firearms trace records and information, and I encourage you to pursue an appeal of this case by seeking a writ of certiorari from the United States Supreme Court. Please do not hesitate to contact me if I may be of further assistance in this effort.

Sincerely,

Raymond W. Kelly
Police Commissioner

APPENDIX   B



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

# Youth Crime Gun Interdiction Initiative
# Memorandum of Understanding

The parties signing this Memorandum of Understanding hereto agree that is to our mutual benefit to cooperate in eliminating the illegal flow of firearms to youth through enforcement efforts involving the investigation and prosecution of illegal gun traffickers and through study focusing on the illegal youth firearms market to determine trends, patterns, and scopes of that market and developing strategies to address the market.

## BACKGROUND:

The Department of the Treasury-Enforcement and the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) developed the Youth Crime Gun Interdiction Initiative (YCGII) in partnership with the Department of Justice-Office of Community Oriented Policing Services (COPS) and the National Institute of Justice (NIJ). In general, need for the YCGII stemmed from the fact that firearms related youth homicides have nearly tripled since 1985. Importantly, through intervention in the illicit firearms markets, we will try to reduce or stop the upward spiral of youth on youth firearms related homicides.

To accomplish this, the YCGII will not be strictly limited to focusing on illegal traffickers of firearms to the federally defined "juvenile". Rather, participating ATF field offices and police departments will focus on illegal firearms traffickers to youth (those defined under 18 years of age) with flexibility to focus on illegal firearms traffickers who supply young people up to 24 years of age if circumstances warrant.

## PURPOSES:

This memorandum will formalize relationships between ATF and the New York City Police Department (NYPD) with regard to policies, procedures, utilization of resources, and planning/training in order to maximize interagency cooperation and coordination.

## FOUR NATIONWIDE INTER-RELATED OBJECTIVES:

1.    Working with the U.S. Attorneys and New York City District Attorneys to intensify ATF and NYPD efforts to investigate and incarcerate individuals who illegally traffic in firearms to young people and ensure those arrested are prosecuted in the proper venue (to be determined on a case-by-case basis);

2.    To ensure that the New York City Police Department trace all crime guns recovered, and in particular, those firearms taken from youths;

- 1 -

3.       To combine the efforts of ATF Special Agents, NYPD Police Officers/NYPD Detectives and NIJ researchers to develop new methods of mapping illegal firearms trafficking patterns and practices, especially as this relates to the illegal trafficking of firearms to youths;

4.       To provide more ATF support to the New York City Police Department efforts aimed at intervening in the illegal local youth firearms market.

## CONDITIONS AND PROCEDURES:

- ATF and NYPD acknowledge their understanding that the operation described in this MOU is subject to audit by ATF; the U.S. Department of Justice-Office of Inspector General, the General Accounting Office, and other auditors designated by the United States Government. Such audits may include reviews of any and all records, documents, reports, accounts, invoices, receipts, or other evidence;

- The parties agree that premature disclosure of certain firearms trace information can reasonably be expected to interfere with pending or prospective law enforcement proceedings. This law enforcement sensitive information includes data that can link a traced firearm to: the location of a crime, the Federal firearms licensee; retail purchaser or possessor of a traced firearm; or to firearms trafficking patterns involving a traced firearm. It is agreed that the law enforcement firearms trace information generated pursuant to this Agreement shall not disclose to a third party without the consent of ATF and the NYPD.

## CONCLUSION:

It is the intent of the signatories that this agreement ensures coordination, cooperation and the mutual conduct of enforcement and research activities. The result of this mutual cooperation and coordination will be the successful prosecution of illegal firearms in State and Federal jurisdictions as well as the development of an accurate picture of the illegal youth firearms market and the development of new strategies to effectively interrupt this market and impact on the rate of juvenile related firearms violence. The research findings will be published at the conclusion of the initiative.

Parties to this agreement may terminate their participation at any time upon written notification of their intent to withdraw to the other party in the Agreement. At such time that other Federal government resources may become available, a new Memorandum of Understanding may be initiated.

In witness whereof, the parties have hereunto executed this Memorandum of Understanding.

William G. McMahon
Special Agent in Charge
ATF, New York Field Division

Raymond Kelly
Commissioner
New York City Police Department

7/28/03
Date

7/21/03
Date

- 3 -

APPENDIX   C

NY Times ·

May 21, 2004

# City Wins Right to U.S. Data on Firearms

By WILLIAM GLABERSON

New York City won a significant victory this week in its civil suit against the firearms industry, winning the right to information that could help prove its claim that the industry closes its eyes to the way guns get into the hands of criminals.

On Wednesday, a federal magistrate ruled that the city was entitled to federal data that traces the path of guns used in crimes, overruling objections by the Justice Department. Lawyers say that without the data the city would have difficulty proving its claim that the gun industry's marketing and distribution practices amount to a public nuisance.

The ruling by Magistrate Judge Cheryl L. Pollak, in Federal Court in Brooklyn, waded into a contentious legal and political issue over the Bush administration's reluctance to release the tracing data, which is likely to be helpful to civil suits against the industry around the country. Access to the data has provoked battles in Congress and in the United States Supreme Court, with the gun industry and its opponents squaring off over whether it should be released.

In 2003 and again this year, the Republican-controlled Congress enacted appropriations measures saying that no funds could be used to release the tracing data. Some supporters said the information could undermine police investigations, while industry opponents said groups like the National Rifle Association had slipped the measure in, to hobble the civil suits against the gun industry.

A Justice Department lawyer suggested during arguments in the city's case that the department, under Attorney General John Ashcroft, had changed a government policy that permitted the limited release of the information in an earlier lawsuit.

The lead lawyer on the case at the city's Law Department, Eric Proshansky, said yesterday that the data would enable the city to prove that gun makers have failed to protect the public.

Judge Pollak's decision, Mr. Proshansky said, "is important to the city because the proof in these suits is developed by demonstrating through these databases that the gun industry knows about problems in the distribution networks" that end in sales of guns to criminals.

A similar battle over a demand for the same information from the City of Chicago is being fought in the courts.

The data from the Bureau of Alcohol, Tobacco and Firearms includes the sales history of guns that law enforcement agencies seek to trace. Many of those tracing requests are begun after guns are found in crime investigations. Taken together, the traces can provide a roadmap showing, for example, that some dealers can be identified as tied more often to guns used in crime than others.

Sheree Mixell, the spokeswoman for the bureau, which fought the release of the information, said lawyers were reviewing the decision but the agency would not comment on pending litigation. But other lawyers said they

thought it likely that the bureau would appeal, first to the United States district judge handling the city's case, Jack B. Weinstein, and then possibly to an appeals court.

In a lawsuit by the National Association for the Advancement of Colored Peoplethat raised claims similar to those in the city's suit, the bureau agreed to release some of the information in 2002. Under that agreement, the access to the information was strictly limited and the information could not be used in any other suit.

The N.A.A.C.P. suit failed. But in a decision last year Judge Weinstein seemed to indicate that the city's suit might have a better chance at success.

Some law enforcement officials have been highly critical of the release of the gun-tracing information, saying it is intended for law enforcement purposes and that its release could compromise investigations by showing which cases police agencies are pursuing.

In a letter to Mr. Ashcroft in 2002, the New York police commissioner, Raymond W. Kelly, took a position that undercut the argument of the city's civil lawyers in the case against the gun industry. Mr. Kelly said release of the information would "compromise critical law enforcement investigations and endanger the lives of police officers and members of the public."

Backed by the gun industry, the bureau's lawyers argued in the city's case that the appropriations measures barred the bureau from releasing the information.

In her decision Judge Pollak disagreed, saying that the bureau was required to turn over the data under a city subpoena. The city had agreed that the data would not be distributed outside the case. "Congress," she wrote, "did not intend to restrict civil litigants from receiving firearms data pursuant to judicial subpoena."

In a filing in the case, Mr. Proshansky cited remarks made by a federal lawyer at a hearing last month suggesting that the government's policy had changed under Mr. Ashcroft.

The lawyer, Barry Orlow, deputy associate chief counsel of the bureau, had noted that the firearms bureau was transferred from the Treasury Department to the Justice Department during the government's Homeland Security reorganization in 2003.

"We don't work for the secretary of the Treasury anymore, we work for the attorney general," Mr. Orlow said, adding that "policy considerations have changed."

New York Law Journal, May 24, 2004

# Magistrate Judge Backs City In Bid for Gun Crime Data

## Court Rejects ATF Claim That U.S. Law Prohibits Release

**BY TOM PERROTTA**

LEGISLATION in a federal appropriations bill cannot block New York City from obtaining data on gun crimes for its lawsuit against the gun industry, a federal magistrate in Brooklyn has ruled.

The ruling, if upheld, would clear the way for the city to use data from the U.S. Bureau of Alcohol, Tobacco, and Firearms (ATF) in its attempt to prove that gun manufacturers have fueled the illegal gun market in the city.

The manufacturers, the city alleges, have contributed to a public nuisance through irresponsible marketing and distribution practices that make it easy for criminals to obtain guns.

The data were at the center of a similar lawsuit, brought by the National Association for the Advancement of Colored People, that failed last year when Eastern District Judge Jack B. Weinstein ruled the organization did not have standing to sue. But the judge, who is presiding over the city's suit as well, has said the city — acting on behalf of its citizens — likely would be in a better position to sue than the NAACP.

For the NAACP lawsuit, the ATF agreed to give the NAACP sales data


The decision will be published Thursday.

it collects on firearms used in crimes under the condition that the data would be used for the lawsuit and not released to the public.


Judge Pollak

When the city subpoenaed ATF for the data, however, the agency said a provision included in the Consolidated Appropriations Act of 2004 barred it from releasing the data.

A version of the provision was passed in similar fashion in 2003. This year's version was directed by numerous lawmakers when it was included in the appropriations bill, and gun industry opponents said it was an attempt to shield manufacturers from suits.

Last week, however, U.S. Magistrate Judge Cheryl L. Pollak ruled the provision, as written, prevented the ATF only from using appropriations to release data to the public. It did not, she said, stop the bureau from complying with a subpoena in a civil suit where the plaintiffs have agreed to keep the data out of public view.

"This Court concludes that the plain meaning of the 2004 Act, as well as the discernible Congressional intent in enacting that legislation, supports a finding that the 2004 Act does not apply to the disclosure of firearms data to civil litigants pursuant to subpoena, when that data will remain subject to a confidentiality order," Magistrate Judge Pollak wrote in *City of New York v. Beretta U.S.A. Corp.*, 00 CV 3641.

Magistrate Judge Pollak's ruling is subject to review by Judge Weinstein.

The attorney handling the suit for the city said the ruling was an important victory.

"It's the sort of core data that you can use to prove that there are certain gun dealers and distributors whose guns seem to fall into criminal hands all the time," Assistant Corporation Counsel Eric Proshansky said. "If we can see this in the data, why didn't gun manufacturers see it and do something about it?"

Robert J. Nardoza, a spokesman for the Eastern District U.S. Attor-

ney's Office, which represented the ATF bureau, said the office w[as] reviewing the ruling and had n[ot] decided whether to appeal.

Magistrate Judge Pollak noted th[at] the appropriations bill said nothi[ng] about lawsuits, though Congress [in] the past has specifically barred inf[or]mation — such as consumer produ[ct] safety reports — from being used [in] litigation.

"If Congress had intended to p[re]vent all disclosures of such inform[a]tion, even in the context of a judic[ial] subpoena subject to a protecti[ve] order, it could have expressly in[di]cated that intent in the statute," s[he] wrote.

The ATF also argued that relea[s]ing the data could jeopardize inve[s]tigations into illegal firearms. It cit[ed] a 2002 letter from New York Ci[ty] Police Commissioner Raymond [W.]

> *Magistrate Judge Pollak noted that Congress said nothing about lawsuits in the appropriations bill cited by the ATF.*

Kelly to Attorney General Joh[n] Ashcroft, in which Mr. Kell[y] "expressed concern" about a U.[S.] Court of Appeals for the Seventh Ci[r]cuit ruling that would have release[d] ATF data to the city of Chicago fo[r] its gun suit.

Making the data public, Mr. Kell[y] said, "would be catastrophic for law enforcement" and "would compro[]mise national security."

The Chicago suit has been stall[ed] by the provision in the 2003 appro[]priations bill, since that city request[]ed the information through the Freedom of Information Law and planned to make it public.

Despite Mr. Kelly's letter, M[r.] Proshansky said that the city and the police department are not at cros[s] purposes. Unlike New York officials, he said, Chicago did not plan [] to keep the data confidential. He sai[d] the city and the police departmen[t] were in agreement that the data should not be released to the gener[]al public.

In rejecting ATF's claim of law enforcement privilege, Magistrate Judge Pollak said the agency's con[]cerns about compromising investi[]gations were "wholly inapplicable" to the production of the data at issue pursuant to a protective order."

"Such an order," the magistrate judge said, "would prevent any harm to ongoing or future law enforcement investigations."

Assistant U.S. Attorney Elliot M. Schachner argued on behalf of the ATF.

---

### ■ LEGAL HISTORY ■

## A 125-Year Chronicle Of Law and Politics

**BY JOHN CAHER**

ALBANY — When the New York State Bar Association went looking for writers to author a historical account of the organization, it settled on one social cultural historian and one political historian — both of whom happen to be married to lawyers.

This spring, the efforts of co-authors Deborah S. Gardner and Christine G. McKay came together in a 214-page book chronicling 125 years of cultural sea change and political evolution, all from the perspective of the men — and eventually the women — who built, nurtured and maintain the largest voluntary bar association in the United States.

"Of Practical Benefit" offers insight and perspective into more than a century of legal and societal development.

It describes the heated 1876 presidential contest between attorneys Rutherford B. Hayes and

*History of the New York State Bar Association*

Samuel J. Tilden, which occurred just weeks after the Bar Association was formed. Although *Tilden v. Hayes* was not exactly a precursor to *Bush v. Gore*, it was similar. Mr. Tilden, governor of New York, won the popular vote but lost the electoral vote and his challenge reaffirmed the electoral college system.

It traces the journey of the bar group as it joined and in some cases led the civil rights movement.

The State Bar stood up for several Socialists duly elected to the state Legislature during the Red Scare, but expelled from the Assembly on the grounds that membership in an internationalist party precluded loyalty to state interests. At its 1921 annual meeting, the State Bar condemned the Legislature's actions by a 131-100 vote.

And the book provides a bird's eye view of a profession and pro-

Continued on page 6

D E C L A R A T I O N

      Vanessa Lee   , hereby declares and states as follows:

That on the 2nd day of **June - 2004**, I delivered by Federal Express mail pick-up station at One Pierrepont Plaza, Borough of Brooklyn, County of Kings, City and State of New York, the following:

**Bureau of Alcohol, Tobacco, Firearms and Explosives' Objectives to Order of Magistrate Judge Dated May 19, 2004**

of which the annexed is a true copy, contained in a securely enclosed postpaid wrapper directed to the person(s) at the place(s) and address(es) as follows:

**Leonard Rosenbaum, Esq.**
**Renzulli Pisciotti & Renzulli, LLP**
**310 East 42nd Street**
**New York, N.Y. 10017-5947**

**Paul L. Kassirer, Esq.**
**Lester Schwab Katz & Dwyer, LLP**
**120 Broadway**
**New York, NY 10271-0071**

**Kenneth Marder, Esq.**
**Taub & Marder**
**450 Seventh Avenue, 37th Floor**
**New York, NY 10123**

**Eric Proshansky, Esq.**
**Assistant Corporation Counsel**
**NYC Law Department**
**100 Church Street**
**New York, NY 10007**

2

**Elisa Barnes, Esq.**
**111 Broadway, 4th Floor**
**New York, NY 10006**

The undersigned affirms under penalty of perjury
that the foregoing is true and correct.

Dated:    Brooklyn, New York
          June 2, 2004


                                    _Vanessa Lee_
                                    Vanessa Lee